**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RICHARD SCARANTINO, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ZAYO GROUP HOLDINGS, INC., DAN CARUSO, RICK CONNOR, SCOTT DRAKE, DONALD GIPS, STEVEN KAPLAN, CATHY MORRIS, LINDA ROTTENBERG, YANCEY SPRUILL, and EMILY WHITE,<br><br>Defendants. | ) | Case No. _______________<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on May 8, 2019 (the "Proposed Transaction"), pursuant to which Zayo Group Holdings, Inc. ("Zayo" or the "Company") will be acquired by affiliates of Digital Colony Partners and EQT Infrastructure Fund.

2. On May 8, 2019, Zayo's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Front Range TopCo, Inc. ("Parent") and Front Range BidCo, Inc. ("Merger Sub"). Pursuant to the terms of the Merger Agreement, Zayo's stockholders will receive $35.00 in cash for each share of Zayo common stock they own.

3. On June 3, 2019, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission (the "SEC") in connection with the Proposed Transaction.

4. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Zayo common stock.

9. Defendant Zayo is a Delaware corporation and maintains its principal executive offices at 1821 30th Street, Unit A, Boulder, CO 80301. Zayo's common stock is traded on the New York Stock Exchange under the ticker symbol "ZAYO." Zayo is a party to the Merger

Agreement.

10. Defendant Dan Caruso is Chief Executive Officer, Co-Founder, and Chairman of the Board of the Company.

11. Defendant Rick Connor is a director of the Company.

12. Defendant Scott Drake is a director of the Company.

13. Defendant Donald Gips is a director of the Company.

14. Defendant Steven Kaplan is a director of the Company.

15. Defendant Cathy Morris is a director of the Company.

16. Defendant Linda Rottenberg is a director of the Company.

17. Defendant Yancey Spruill is a director of the Company.

18. Defendant Emily White is a director of the Company.

19. The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

**CLASS ACTION ALLEGATIONS**

20. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Zayo (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21. This action is properly maintainable as a class action.

22. The Class is so numerous that joinder of all members is impracticable. As of May 6, 2019, there were approximately 235,583,764 shares of Zayo common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23. Questions of law and fact are common to the Class, including, among others, whether defendants violated the Exchange Act and whether defendants will irreparably harm

plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company and the Proposed Transaction*

27. Zayo provides mission-critical bandwidth to the world's most impactful companies.

28. The Company has a 130,000-mile network in North America and Europe, including extensive metro connectivity to thousands of buildings and data centers.

29. Zayo's communications infrastructure solutions include dark fiber, private data networks, wavelengths, Ethernet, dedicated Internet access, and colocation services.

30. The Company owns and operates a Tier 1 IP Backbone and 51 carrier-neutral data centers.

31. Through its Cloudlink service, the Company provides low latency private connectivity that attaches enterprises to their public cloud environments.

32. The Company serves wireless and wireline carriers, media, tech, content, finance, healthcare, and other large enterprises.

33. On May 8, 2019, Zayo's Board caused the Company to enter into the Merger Agreement.

34. Pursuant to the terms of the Merger Agreement, Zayo's stockholders will receive $35.00 in cash for each share of Zayo common stock they own.

35. According to the press release announcing the Proposed Transaction:

> Zayo Group Holdings, Inc. ("Zayo" or "the Company") (NYSE: ZAYO), which provides mission-critical bandwidth to the world's most impactful companies, today announced that it has signed a definitive merger agreement to be acquired by affiliates of Digital Colony Partners ("Digital Colony") and the EQT Infrastructure IV fund ("EQT" or "EQT Infrastructure"). The transaction would result in Zayo transitioning from a public company to a private company. Under the new ownership, the Zayo team would continue to execute the Company's strategy and remain headquartered in Boulder, Colorado.
>
> Under the terms of the agreement, which was unanimously approved by Zayo's Board of Directors, shareholders will receive $35.00 in cash per share of Zayo's common stock in a transaction valued at $14.3 billion, including the assumption of $5.9 billion of Zayo's net debt obligations. The offer price represents a 32% premium to the volume-weighted price average of the last six months of $26.44. . . .
>
> The closing of the deal is subject to customary conditions, including regulatory clearance and Zayo shareholder approvals. The transaction is expected to close in the first half of calendar 2020.

36. The Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 4.2(a) of the Merger Agreement provides:

> Except as expressly permitted by Section 4.2(b), until the Effective Time or, if earlier, the termination of this Agreement, the Company shall not nor shall it authorize or permit its Representatives, Subsidiaries or their Representatives to, directly or indirectly, (i) solicit, initiate, assist or knowingly encourage, cooperate or facilitate (including by way of furnishing information) the submission by any Person (other than Parent, Merger Sub or their Representatives) of an Alternative Acquisition Proposal, or any inquiry, proposal or offer that is reasonably likely to lead to an Alternative Acquisition Proposal, (ii) engage in, continue or otherwise participate in any negotiations or discussions regarding an Alternative Acquisition Proposal, (iii) provide any information or data to any Person relating to the Company or any of its Subsidiaries, in any such case with the intent to induce the making, submission or announcement of, or to encourage, facilitate or assist, an Alternative Acquisition Proposal, (iv) enter into any acquisition agreement, merger agreement, letter of intent, agreement in principle or similar written agreement (other than an Acceptable Confidentiality Agreement in accordance with Section 4.2(b)) with respect to any Alternative Acquisition Proposal (any of the foregoing, an "Alternative Acquisition Agreement") or (v) resolve, propose or agree to do any of the foregoing. The Company shall, and shall instruct and cause each of its Subsidiaries and shall instruct each of the Representatives of the Company and its Subsidiaries to, (x) immediately cease and cause to be terminated all discussions and negotiations with any Person (or its Representatives) with respect to any Alternative Acquisition Proposal and (y) request the prompt return or destruction of all non-public information previously furnished in connection therewith (subject to the terms of any then-existing confidentiality agreements between the Company and such Person) and immediately terminate all physical and electronic dataroom access previously granted to any such Person or its Representatives.

37. Additionally, the Company must promptly advise Parent of any proposals or inquiries received from other parties. Section 4.2(c) of the Merger Agreement states:

> The Company shall promptly (and in any event within 24 hours of receipt) notify Parent in writing in the event the Company or any of its Subsidiaries or, to its Knowledge, its Representatives receives (i) any Alternative Acquisition Proposal, (ii) any inquiry or request for information, discussion or negotiation that is reasonably likely to lead to an Alternative Acquisition Proposal, or (iii) any proposal or offer that is or is reasonably likely to lead to an Alternative Acquisition Proposal, in each case of the foregoing clauses (i), (ii) and (iii), together with the material terms and conditions of such inquiry, request, proposal or offer, subject to confidentiality agreements in effect on the date hereof, the identity of the Person making any such inquiry, request, proposal or offer, and a copy of any written proposal, offer or draft agreement provided by such Person. The Company shall keep Parent informed (orally and in writing) in all material respects on a timely and current basis of the status and details (including, within 24 hours after the occurrence of any material amendment or modification) of any such Alternative

> Acquisition Proposal, request, inquiry, proposal or offer, including furnishing copies of any written inquiries, correspondence and draft documentation with respect thereto.

38. Moreover, the Merger Agreement contains a restrictive "fiduciary out" provision permitting the Board to change its recommendation of the Proposed Transaction under extremely limited circumstances, and grants Parent a "matching right" with respect to any "Superior Proposal" made to the Company. Section 4.2(e) of the Merger Agreement provides:

> Notwithstanding anything to the contrary set forth in this Agreement, prior to the time the Company Stockholder Approval is obtained, but not after, the Company Board may in accordance with this Section 4.2(e), if the Company Board determines in good faith (after consultation with outside legal counsel and its financial advisor(s)) that the failure to do so would be inconsistent with the Company Board's fiduciary duties under applicable law, (i) effect a Change of Recommendation in response to a Superior Proposal or an Intervening Event or (ii) solely in response to a Superior Proposal received after the date hereof and that did not result from a material breach of this Section 4.2, take action pursuant to Section 6.1(f); provided, that: (A) the Company shall have provided prior written notice to Parent and Merger Sub, at least four Business Days in advance, of its intention to effect a Change of Recommendation or to take action pursuant to Section 6.1(f), which notice shall, if applicable and subject to the confidentiality agreements in effect on the date hereof, specify the material terms thereof (including copies of all proposed transaction documents) and the identity of the party making a Superior Proposal; (B) after providing such notice and prior to effecting such Change of Recommendation or taking such action pursuant to Section 6.1(f), the Company shall, and shall cause its Representatives to, negotiate with Parent and Merger Sub in good faith (to the extent Parent and Merger Sub desire to negotiate) to make such adjustments in the terms and conditions of this Agreement as would permit the Company not to effect a Change of Recommendation or take such action pursuant to Section 6.1(f), including providing Parent the opportunity to make a presentation to the Company Board regarding this Agreement and any proposed adjustments thereto; and (C) the Company Board shall have considered in good faith any changes to this Agreement and the Financing Letters offered in writing by Parent in a manner that would form a binding contract if accepted by the Company and shall have determined that the failure to make a Change of Recommendation or terminate this Agreement, as applicable, would reasonably be expected to be inconsistent with its fiduciary duties under applicable law even if such changes were to be given effect and, in the case of a Superior Proposal, that such Superior Proposal would continue to constitute a Superior Proposal if such changes were to be given effect. In the event of any material revisions to any such Superior Proposal, the Company shall be required to deliver a new written notice to Parent and Merger Sub and to comply with the

> requirements of this Section 4.2(e) with respect to such new written notice, except that the deadline for such new written notice shall be reduced to three Business Days before the Change of Recommendation or action pursuant to Section 6.1(f) (rather than the four Business Days otherwise contemplated by this Section 4.2(e)) (it being understood that in no event shall such additional three Business Day period be deemed to shorten the initial four Business Day period).

39. The Merger Agreement also provides for a "termination fee" of $209,718,868 payable by the Company to Parent if the Individual Defendants cause the Company to terminate the Merger Agreement.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

40. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

41. As set forth below, the Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

42. The Proxy Statement omits material information regarding the Company's financial projections and the analyses performed by the Company's financial advisors in connection with the Proposed Transaction, J.P. Morgan Securities LLC ("J.P. Morgan") and Goldman Sachs & Co. LLC ("Goldman").

43. With respect to the Company's financial projections, the Proxy Statement fails to disclose, for each set of projections: (i) all line items used to calculate EBITDA; (ii) all line items used to calculate Adjusted UFCF; and (iii) a reconciliation of all non-GAAP to GAAP metrics.

44. With respect to J.P. Morgan's Discounted Cash Flow Analysis, the Proxy Statement fails to disclose: (i) the unlevered free cash flows used by J.P. Morgan in the analysis and all underlying line items; (ii) the range of terminal values of the Company; (iii) the individual inputs and assumptions underlying the range of discount rates from 7.5% to 8.5% and the growth rates ranging from 1.5% to 3.0%; and (iv) the Company's net debt.

45. With respect to J.P. Morgan's Analysts Price Targets analysis, the Proxy Statement fails to disclose: (i) the price targets for the Company; and (ii) the sources thereof.

46. With respect to J.P. Morgan's Illustrative Sum of the Parts Analysis – Public Trading Multiples, the Proxy Statement fails to disclose: (i) the net debt balance; and (ii) J.P. Morgan's basis for selecting EV/EBITDA reference ranges for the Company of 14.0x to 16.0x for the core communications infrastructure business and 4.5x to 6.5x for the enterprise customer business.

47. With respect to J.P. Morgan's Illustrative Sum of the Parts Analysis – Selected Transactions, the Proxy Statement fails to disclose J.P. Morgan's basis for selecting EV/EBITDA reference ranges for the Company of 13.0x to 16.0x for the core communications infrastructure business and 4.5x to 6.5x for the enterprise customer business.

48. With respect to J.P. Morgan's Present Value of Future Share Price Analysis, the Proxy Statement fails to disclose: (i) J.P. Morgan's basis for applying a range of illustrative forward FV/EBITDA multiples of 9.5x to 14.0x to estimated EBITDA of the Company for the calendar year 2020, estimated EBITDA for the calendar year 2021, and estimated EBITDA for the calendar year 2022; (ii) the individual inputs and assumptions underlying the discount rate of 9.5%; and (iii) the fully diluted outstanding shares of the Company.

49. With respect to Goldman's Illustrative Present Value of Future Share Price Analysis, the Proxy Statement fails to disclose: (i) Goldman's basis for applying an illustrative range of one-year forward EV/EBITDA multiples of 9.0x to 13.0x to estimated EBITDA for calendar year 2020, estimated EBITDA for calendar year 2021, and estimated EBITDA for calendar year 2022; (ii) the Company's net debt; (iii) the number of fully diluted outstanding shares of the Company; and (iv) the individual inputs and assumptions underlying the illustrative discount

rate of 8.0%.

50. With respect to Goldman's Illustrative Discounted Cash Flow Analysis, the Proxy Statement fails to disclose: (i) the individual inputs and assumptions underlying the illustrative discount rates ranging from 7.0% to 8.0% and the range of perpetuity growth rates of (0.5)% to 3.5%; (ii) the unlevered free cash flows used by Goldman in the analysis and all underlying line items; (iii) the range of illustrative terminal values for the Company; (iv) Goldman's basis for applying an illustrative terminal value to EBITDA multiple range of 10.0x to 14.0x to estimated terminal year EBITDA for the Company; (v) the Company's net debt; and (vi) the number of fully diluted outstanding shares of the Company.

51. With respect to Goldman's Premia Analysis, the Proxy Statement fails to disclose: (i) the transactions observed by Goldman in the analysis; and (ii) the premiums paid in the transactions.

52. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

53. The Proxy Statement also omits material information regarding potential conflicts of interest of Goldman.

54. The Proxy Statement provides that "Goldman Sachs [] has provided certain financial advisory and/or underwriting services to [Digital Colony Management, LLC, which is

affiliated with a significant equityholder of Parent] and/or its affiliates and portfolio companies from time to time for which the Investment Banking Division of Goldman Sachs has received, and may receive, compensation." However, the Proxy Statement fails to disclose the timing and nature of such services and the amount of compensation received or to be received by Goldman for such services.

55. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

56. The omission of the above-referenced material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) Background of the Merger; (ii) Reasons for the Merger; Recommendation of the Board of Directors; (iii) Opinions of the Company's Financial Advisors; and (iv) Management Projections.

57. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

**COUNT I**

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Zayo**

58. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

59. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Zayo is liable as the issuer of these statements.

60. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

61. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

62. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

63. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

64. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

65. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

**Claim for Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants**

66. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

67. The Individual Defendants acted as controlling persons of Zayo within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Zayo and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power

to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

68. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

69. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy Statement.

70. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

71. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: June 7, 2019

**RIGRODSKY & LONG, P.A.**

By: */s/ Gina M. Serra*
Brian D. Long (#4347)
Gina M. Serra (#5387)
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
Email: rm@maniskas.com